Susan WRIGHT and Edward T. Wright, Appellants-Respondents,

v.

Stephen EDISON and Donna Edison, Respondents-Appellants.

Nos. 42488, 42526.

Missouri Court of Appeals, Eastern District, Division Two.

June 2, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 10, 1981.

Application to Transfer Denied Sept. 8, 1981.

 

Edward T. Wright, James R. Hanlin, St. Louis, for appellants-respondents.

Justin C. Cordonnier, St. Louis, for respondents-appellants.

WEIER, Judge.

Plaintiffs Susan and Edward Wright sold their house in Brentwood to defendants Donna Edison and Stephen Edison. An offer had been made to the Wrights on March 9, 1976, which was refused and a counter offer or proposal was accepted by the Edisons after they had thoroughly inspected the house and had a conversation with Mr. Wright on March 13, 1976. The closing was to be on April 28, 1976. This controversy centers around the extent of authority or license given by Wright to the Edisons on March 13 during the course of the conversation at the house. According to Mr. Wright, Edisons informed him that it would take three months to get the carpeting. To place their order they wanted to measure the floors and Wright told them that they could come in the house for that purpose. He further gave them a key so they could come in the next week to do the measuring. They were then to drop the key off at Wright's office. He denied that there was any discussion at all relative to doing any work at the house prior to the time that they were to receive possession. Mr. Edison's version indicated that two men were at the house on Saturday when the conversation occurred measuring for carpeting and wallpaper and that Mr. Wright did not voice any objection to this going on. Edison said that he had a brief conversation with Wright in regard to workmen coming in and doing preliminary work and further indicated that this matter had already been cleared with his real estate agent. As to the key, Edison stated that Wright informed him he could have the key and the workmen could come in any time and then Edison would not have to go by Wright's office to pick it up. Wright and his wife were going to Florida and according to Edison's version the key arrangement was made for their convenience. The real estate agent who represented the Edisons testified that he told Mr. Wright that the Edisons wanted workmen to come into the house prior to cleaning the place. Wright told him according to this version that he "might agree" but that he also wanted the earnest money which was then being held in escrow before this was done, the reason given being that Wright wanted to spend the earnest money that had been put up. This money was released to the Wrights.

On March 30, 1976, Mr. Wright arrived back in St. Louis and went to the home. He had difficulty getting in the house because he found that the lock on the garage had been changed. When he got in there was no heat in the house and he noticed that painting and interior renovation and construction were in progress. He tried to get the furnace to work but could get no heat. The carpeting had been taken up, wallpaper had been taken off, furniture had been moved around, an antique case had been moved and various objects in it had been broken. Some walls were painted and some were half painted. Draperies had been taken down and thrown over in the corner. There was an accumulation of dust on the furnishings and throughout the house. Water closets in the bathrooms had been ripped out and the walls were also taken out. Carpet rolls were stacked in

some of the rooms and buckets were scattered over the place. The electric refrigerator was disconnected and the food left there was spoiled. The tub in the master bedroom bath was gone. When he called the Edisons they told him that they had sent in various subcontractors, one man putting in an air conditioning unit, others painting and doing carpenter work. When he conversed with the Edisons the next evening on March 31, Edison told him that he understood his real estate man had informed Wright that they were going to do this work on the premises and consent had been given. They both wanted to close with Wrights on April 1 and would pay Wright $5,000 on that day so he could make a payment on a condominium which he and Mrs. Wright were buying. When Wright went to the title company office for the purpose of closing, he insisted on having an understanding in the closing papers that he could file a lawsuit to cover any damages sustained as a result of the workmen coming into the property and performing renovation and decorating work. At the time he said he did not know what damage was done because most of the items belonged to his wife and only she would know what had been damaged. When the Edisons were informed that they had acted beyond the terms of the oral agreement, all further work on the property was stopped. The Wrights stayed at a motel for some five days and then moved back into the house until possession was finally delivered to the Edisons.

After the closing of the sale of the real estate and the removal of the Wrights and their personal possessions from the property, suit was filed by Mr. and Mrs. Wright against Mr. and Mrs. Edison seeking both actual and punitive damages. After detailing the money items of injury to personal property and to various fixtures and appurtenances belonging to the real property, plaintiffs alleged that they had suffered "distress, mental anguish, inconvenience and loss of use and enjoyment of their home" and that "the construction work, painting, removal of plaster, and other activity of Plaintiffs [sic] and others acting in

their behalf caused the Plaintiffs much physical discomfort." Nine persons on the jury believed the Wright version of the conversation held on Saturday, March 13, 1976, and awarded $5,000 actual damages to the plaintiffs. In addition, nine jurors, one of whom did not sign the verdict in favor of the actual damages, awarded plaintiffs $45,000 in punitive damages. Defendants filed a motion for new trial and the court granted the motion for specific reasons set out in the motion as enumerated in the court order. Plaintiffs thereupon appealed to this court seeking to reverse the ruling of the trial court ordering the new trial and asking that the verdict be reinstated and judgment be entered thereon. Defendants have also appealed from the judgment of the court denying their motion for judgment in accordance with their motion for directed verdict on the issue of punitive damages. We affirm the rulings of the trial court for the reasons that follow.

One of the grounds of the motion for new trial upon which the court granted that motion was directed toward the giving of an instruction on damages. The instruction as given was MAI 4.01 and included the phrase authorizing the jury to fix and award future damages. The instruction as given reads as follows:

"If you find the issues in favor of the Plaintiffs, then you must award the Plaintiffs such sum as you believe will fairly and justly compensate the Plaintiffs for any damages you believe they sustained, and are reasonably certain to sustain in the future, as a direct result of the occurrence mentioned in the evidence."

■ This was an improper measure of damages instruction and the court's ruling in granting a new trial should be affirmed for the giving of this instruction if for no other reason. When any ground contained in the motion for new trial and designated by the trial court in support of its ruling is correct, the order granting the new trial should be affirmed. *Claspill v. Craig*, 586 S.W.2d 458, 461[5] (Mo.App.1979).

■ The trial court was correct in determining that error had been committed in the giving of this instruction for two reasons. First, MAI 4.01 should only be given where there has been damage to both the person and property. There were no allegations of personal injury and no evidence was offered with respect thereto. Plaintiffs made reference to mental anguish, inconvenience and a loss of use of their home. There is no proof, however, of any injury to their person which arose out of the facts that were litigated. The pleadings and the evidence were directed to a trespass on real estate and damage to personal property that belonged to the plaintiffs. The proper instruction to give where there is property damage only is MAI 4.02 which sets as a standard the difference between the fair market value of the property before it was damaged and the fair market value after. An additional sum may be allowed for the loss of use of the property until it can reasonably be repaired or replaced where there is evidence to justify. Most of plaintiffs' evidence with regard to damages consisted of so-called "out-of-pocket expense." Such items as cleaning and repairing personal property and the expense of the Wrights in staying at a motel until the house could be placed in a condition where they might return and live there were given as to amount but there was never any evidence with respect to the difference in value between the value of the personal property or the real estate before and after the damage had occurred. As is indicated by MAI 4.02, compensation for loss of use may be a proper item and certainly the expenses attendant upon living elsewhere until the house could be restored to a condition that would be suitable for habitation would be an item of expense that could be included in damage. The cost of repair to other items of property is an appropriate measure in only some rare instances. Where repairs to personal property such as an automobile result in causing it to be more valuable than it was before the injury, such excess must be deducted from the cost of repairs. On the other hand if the item after repairs are made is still not as valuable as it was before the injury, then the owner may recover in addition to the cost of repairs such amount as will equal the difference between the value of the item of personal property before the injury and after the repairs were made upon it. *Hayes v. Dalton*, 257 S.W.2d 198, 201 (Mo.App.1953). In such cases the MAI 1980 Supplement suggests that where the cost of repair is the appropriate measure of damages another instruction be given and it is there set out in the notes on use.

■ Rule 70.01 provides that an instruction applicable in a particular case must be given to the exclusion of any other. Violation of this rule constitutes error and its prejudicial effect must be judicially determined. Deviations from this rule are presumed prejudicially erroneous "unless it is made perfectly clear that no prejudice has resulted." *Murphy v. Land*, 420 S.W.2d 505, 507[4] (Mo.1967). The problem of giving MAI 4.01 in a property damage case is thoroughly discussed in *State ex rel. State Highway Commission v. Beaty*, 505 S.W.2d 147, 153, 154 (Mo.App.1974). Failure to give MAI 4.02 is there held to be prejudicial error even though the jury returned a verdict that corresponded to the testimony as to the difference in reasonable market value before and after the incident. Considering the instruction given and the proof of damage, the jury here was allowed to speculate and it is difficult to understand how they came up with the sum of $5,000 as being the actual damages suffered by the plaintiffs because there was no testimony to sustain this finding. The court should therefore be sustained on its ruling awarding a new trial based upon the failure of the plaintiffs to offer and the failure of the court to give the proper damage instruction.

■ The court's ruling with respect to the giving of Instruction No. 5 is further erroneous and the court must be sustained in granting the motion for new trial on account of giving the instruction because it authorized the award of future damages. Evidently, plaintiffs believe that they are entitled to future damages because of alleged nervousness of pet cats which they

believe to have been made nervous because of being confined in one of the rooms of the house while plaintiffs were in Florida. The measure of damages to animals is the difference between fair market value of the animals immediately before and immediately after the alleged injury. *Barber v. M. F. A. Milling Company*, 536 S.W.2d 208, 210 (Mo.App.1976). Nervousness of cats may be considered a factor in arriving at an opinion of value but the jury should not be allowed to speculate on the future behavior of an animal. It may be that someday testimony and instructions may be allowed to authorize future damages for neurotic behavior of animals based upon expert testimony of veterinarians who qualify as specialists in the area of animal behavior but this time is not upon us. As previously stated, there is no testimony with regard to personal injury to either of the plaintiffs nor that they as a result of any personal injury would suffer pain, disability or discomfort in the future.

The trial court also set aside the verdict on the grounds that verdict-directing Instruction No. 3 offered by the plaintiffs was prejudicially erroneous. Instruction No. 3 reads as follows:

"Your verdict must be for Plaintiffs, if you find:

First, defendants, directly or by people acting within the scope and course of agency, trespassed upon property of plaintiffs, and

Second, defendants did not have permission from Plaintiffs to commit such trespassing, or exceeded any permission granted by Plaintiffs relative to such trespassing, and

Third, that as a direct result of such trespass the Plaintiffs sustained damage."

It is not necessary that we consider this problem to sustain the trial court in its determination that the motion for new trial should be sustained because this has already been determined. *See Claspill v. Craig, supra* at 461. Since this case must be retried, however, we will discuss the contentions of the plaintiffs' as to this instruction. One of

the problems found with the instruction concerned its failure to define the term "trespass." It is clear the meaning of non-technical, readily understandable phrases need not be explained. *Koehler v. Burlington Northern, Inc.*, 573 S.W.2d 938, 944[12] (Mo.App.1978). But where technical legal terms are used in instructions, they must be defined therein. *Yamnitz v. Polytech, Inc.*, 586 S.W.2d 76, 81[7] (Mo.App.1979). The word "trespass" has been the subject of considerable judicial writing as is illustrated in the case of *Mawson v. Vess Beverage Co.*, 173 S.W.2d 606, 612 (Mo.App.1943). It is a word that has a technical legal meaning and if used in an instruction should be defined. Probably the better solution of the problem would be to hypothesize facts which constitute the elements of trespass in this particular case and thus avoid the use of the term.

Another charge directed to the instruction and sustained by the court when it granted defendants' motion for new trial was the use of the term "people" rather than "employees, agents or independent contractors" as pleaded by plaintiffs in their petition. A complaint was directed to the term as being vague, overbroad and allowing the jury a roving commission. A long discussion of this problem would be of no benefit, but we are sure that the plaintiffs upon retrial can rephrase their instruction so as to avoid the charges made.

Other contentions of error that were sustained by the court in its ruling on the motion for new trial alluded to statements by counsel and witnesses for plaintiffs that were found by the court to be of such a nature as to prejudice the minds of the jurors against the defendants. Included also was a charge of jury error in that the nine persons who voted for plaintiffs on the verdict awarding actual damages were not the same jurors who voted for punitive damages. These and other matters raised in the motion will probably not occur or will be avoided upon retrial.

We turn now to defendants' appeal. Defendants contend on appeal that the trial court erred when it failed to grant their

motion for judgment in accordance with their motion for directed verdict on the issue of punitive damages because there was no evidence of legal malice. They point out that the trial court gave as one ground in support of granting a new trial that there is no evidence of legal malice to support punitive damages. They contend that it therefore follows the court should have entered judgment in their favor on this issue notwithstanding the verdict rather than merely granting a new trial on that issue.

Plaintiffs alleged and proved that the defendants entered upon the premises under an oral authorization for the purpose of measuring the house for carpeting. The key was delivered to the defendants for that purpose. The jury by their verdict accepted this version of the controverted facts. As is pointed out in *Wood v. Gregory*, 155 S.W.2d 168, 171 (Mo.1941), this is a license and the defendants were licensees. A license in real property law is a privilege conferred either by writing or by oral permission to do one or more acts on the real estate without possessing any interest therein. It is personal and unassignable and is ordinarily revokable. Such a privilege operates to authorize entry on premises for a certain purpose and a protection to the licensee for acts done by him within the scope of the license. It does not confer or vest any title, interest or estate in such property. When the scope of the license is exceeded or abused, then the acts of the licensee committed in excess of such authority or after the license is revoked may become a trespass for which the licensee may become liable. *Griesenauer v. Emsco Corporation*, 399 S.W.2d 147, 151[4] (Mo.App. 1965). If a trespass is intentional and done without cause or excuse, it is willful and warrants a submission of punitive damages. This is true even though a person acts under a mistaken belief or law or fact, however reasonable, not induced by the owner or possessor of the land. *Beetschen v. Shell Pipe Line Corporation*, 363 Mo. 751, 253 S.W.2d 785, 787[4] (1952). Even though the land is later acquired by the trespasser, the prior owners and possessors of the real estate would still have a right of action for trespass including the claim for punitive damages. *Mapco, Inc. v. Williams*, 581 S.W.2d 402, 406[6] (Mo.App.1979). In that case the transfer of title was brought about by a condemnation after the trespass. Here the plaintiff reserved the right to bring an action against the defendants at the time of closing the real estate transaction and the execution of their deed. We might also point out that in Missouri punitive damages may be recovered for damage to personal property. *State ex rel. Smith v. Greene*, 494 S.W.2d 55, 59[4] (Mo. banc 1973). It is true that plaintiffs failed to prove any substantial damage in the instant case because they failed to submit proof of market value before and after the trespass; but according to plaintiffs' evidence and the theory upon which they tried their lawsuit, a trespass was committed and they were entitled to at least nominal compensatory damages, regardless of whether they suffered any actual damage. *Hyre v. Becker*, 18 S.W.2d 137, 139[1] (Mo.App.1929).

We hold that the trial court was wrong when it concluded that actual malice had to be shown in order to warrant the submission of punitive damages to the jury. Malice may be implied from the intentional acts of the trespasser and thus warrant the submission of punitive damages. It is up to the jury to make a decision as to whether the acts warrant the imposition and award of punitive damages in a suit for trespass. Although the court's conclusion was wrong in its ruling on the motion for new trial on the question of malice, it was correct when it denied defendants' motion for judgment notwithstanding the verdict.

The judgment of the trial court is affirmed and the case is remanded for new trial.

PUDLOWSKI, P. J., and SNYDER, J., concur.