**John KELLEY and Denise Kelley, Plaintiffs/Respondents,**

**v.**

**KELLY RESIDENTIAL GROUP, INC., Defendant/Appellant.**

**John KELLEY and Denise Kelley, Plaintiffs/Appellants,**

**v.**

**KELLY RESIDENTIAL GROUP, INC., Defendant/Respondent.**

Nos. 69756, 69818.

Missouri Court of Appeals, Eastern District, Division Two.

April 1, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 14, 1997.

Application to Transfer Denied June 17, 1997.

---

Gary R. Sarachan, Kenneth J. Rothman, Rothman, Sokol, Adler, Barry & Sarachan, St. Louis, for defendant/appellant.

Steven W. Garrett, Curtis, Oetting, Heinz, Garrett & Soule, P.C., St. Louis, for plaintiffs/respondents.

CRANE, Presiding Judge.

Plaintiff homeowners filed an action against their home builder to recover damages for malicious prosecution, arising out of a dismissed lawsuit the builder had filed against them, and trespass, arising out of home builder's construction of a retaining wall on their property. The jury returned verdicts in favor of the homeowners. However, the trial court entered judgment notwithstanding the verdict (JNOV) in builder's favor on the homeowners' trespass claim. Both parties appeal. We affirm the judgment in homeowners' favor on the malicious prosecution count. We reverse the JNOV in builder's favor on the trespass count and remand for entry of judgment in homeowners' favor in the amount of $1.00 as nominal damages.

### FACTUAL BACKGROUND

We recite the facts in the light most favorable to the verdict. In March, 1993 plaintiffs John and Denise Kelley and their four children moved into a house purchased from and built by defendant Kelly Residential Group on Lot 59C in the Nantucket Subdivision. The lot is adjacent to the Cherry Hills Golf Course. One week after they moved in a golf ball shattered a bay window in the back of plaintiffs' house. Over the next six weeks the bay window was broken again and an upstairs window was broken by golf balls.

In addition, they experienced a continuing problem of golf balls being hit into their yard at a high rate of speed, several of which hit the house. Plaintiffs informed both the golf course and defendant of these incidents. Defendant's president, Mark Kelly, asked John Kelley if he wanted defendant to buy plaintiffs out. John Kelley told him he liked the house but would like defendant's help in working something out with the golf course. Mark Kelly agreed.

When the golf ball problems continued, plaintiff John Kelley sent letters to defendant and Cherry Hills advising them that he considered the golf ball problem a serious safety hazard and requested defendant and Cherry Hills to remedy the problem. Defendant's attorney sent John Kelley a reply letter advising him that his problem was with Cherry Hills not defendant. He wrote: "In the future, please keep your communications between the parties involved, namely, individual property owners (i.e., yourself), individual golfers, and Cherry Hills golf club." John Kelley never told defendant that plaintiffs believed defendant was responsible for the golf ball problem. After he received that letter, John Kelley discussed with Mark Kelly the possibilities of moving dirt or planting trees. Mark Kelly said he would only resod. John Kelley was satisfied and made no demands on Mark Kelly to resolve the problem.

In the summer of 1993, defendant began construction of a house for John and Roberta Riemer on Lot 58C, adjacent to plaintiffs' lot. At the beginning of September, 1993, John Kelley saw Roberta Riemer in the Kelleys' backyard and introduced himself. In the conversation Kelley told her that a lot of golf balls were hit on the property some of which had hit the house and broken three windows. Roberta Riemer asked Kelley to tell this to her husband, John Riemer, who was in the front yard of Lot 58C, which Kelley did. The Riemers asked Kelley about the quality of defendant's work on plaintiffs' house. Kelley told them that defendant had done a good job and that plaintiffs were happy with the materials and the house.

The next day John Riemer met with Mark Kelly and told him that he had become aware of hundreds of golf balls in his neighbor's

garage. Riemer reminded Mark Kelly that he had previously assured Riemer that a ball would only occasionally come on their property. Mark Kelly said he did not believe the problem was that bad, but because the Riemers did not want to live at Lot 58C, he was willing to offer them one or more of the following options: return their money, move them to a different lot, provide landscaping, escrow money for future problems, and reimburse them for expenses incurred as a result of a later closing. That evening, Roberta Riemer called the plaintiffs to further discuss the golf ball problem and asked Denise Kelley whether, if she had the chance, she would move. In response, Denise Kelley said she would "move in a minute" if she had the opportunity.

The next day, while the Riemers were investigating the golf ball problem with other lot purchasers, John Kelley told John Riemer that if defendant offered to buy him out he would accept. The Riemers decided to purchase Lot 34C instead of Lot 58C.

Approximately one week after Labor Day, 1993, John Kelley introduced himself to Kelly and Michael Binz, who told him they had purchased Lot 60C, which is adjacent to the Kelleys' property, and were building a house there. During the conversation John Kelley asked Michael Binz if he was aware of the golf ball problem. Michael Binz replied that he was not aware of any problem but that he was not concerned because he was a golfer. Michael Binz asked John Kelley about defendant and John Kelley told him that he was happy with his house and defendant did a good job. Michael Binz testified that John Kelley did not say anything to him that discouraged him from buying the property. Denise Kelley never met nor spoke with Kelly or Michael Binz before defendant filed its action against the plaintiffs.

Michael Binz testified he told defendant's sales manager, Carol Buckland, that John Kelley had told them about a golf ball problem and his concern for his children's safety. Carol Buckland told Binz that defendant was thinking about suing the plaintiffs. Binz then became concerned about living next door to someone involved in litigation, but completed purchase of the house on Lot 60C.

On September 17, 1993, a few days after the Binz conversation, defendant filed a four-count petition against plaintiffs. In Count I defendant sought damages for tortious interference with its contract with the Riemer trust to construct and sell a home on Lot 58C on September 5, 1993. In Count II defendant sought damages for defamation and slander arising out of statements made to Kelly and Michael Binz on September 14, 1993. In Count III defendant sought damages for prima facie tort, alleging that plaintiffs' acts were intentionally performed to cause injury to defendant. In Count IV defendant sought damages for trespass, alleging plaintiffs had wrongfully entered Lots 58C and 60C on approximately September 5, 1993 and September 14, 1993.

John Kelley hired an engineer who specializes in golf courses to meet with the golf course manager. On September 21, 1993, Cherry Hills moved one of the tees in accord with the engineer's suggestion. Thereafter, although golf balls occasionally came into plaintiffs' property, plaintiffs no longer had a problem with golf balls being hit at a high rate of speed at their house.

In June, 1994, defendant constructed part of a retaining wall for Lot 58C on plaintiffs' property. Defendant did not obtain permission to do so.

On July 6, 1994, defendant dismissed its cause of action against plaintiffs without prejudice. On September 19, 1994, plaintiffs filed a petition against defendant seeking damages for abuse of process and malicious prosecution and for trespass. On October 25, 1994, defendant filed a counterclaim reasserting three of the four counts in its previously dismissed petition: tortious interference with contract, prima facie tort, and trespass.

At the end of the trial, the court dismissed plaintiffs' claim for abuse of process and the prima facie tort and trespass counts of defendant's counterclaim. The jury returned a verdict in plaintiffs' favor on their claims for malicious prosecution and trespass and awarded damages of $15,000.00 to each plaintiff on the malicious prosecution counts and $2,500.00 on the trespass count. The jury

returned verdicts in plaintiffs' favor on the tortious interference count of defendant's counterclaim. The trial court entered judgment in accordance with the jury verdict on the malicious prosecution counts and entered a JNOV in defendant's favor on the trespass verdict.

Defendant appeals the judgment of the trial court in plaintiffs' favor on the malicious prosecution counts. Plaintiffs appeal the JNOV in builder's favor on their trespass count.

### DEFENDANT'S APPEAL

■ For its first point on appeal, defendant asserts that the trial court erred in denying its motions for directed verdict on plaintiffs' malicious prosecution counts because plaintiffs did not prove lack of probable cause on defendant's part to file its action. To succeed on a claim for malicious prosecution, a plaintiff must prove each of six elements: 1) commencement of an earlier suit against plaintiff; 2) instigation of the suit by defendant; 3) termination of the suit in plaintiff's favor; 4) lack of probable cause for the suit; 5) malice by defendant in instituting the suit; and 6) damage to plaintiff resulting from the suit. *State ex. rel. Police Ret. Sys. v. Mummert,* 875 S.W.2d 553, 555 (Mo. banc 1994).

■ Probable cause for initiating a civil action "consists of a belief in the facts alleged, based on sufficient circumstances to reasonably induce such belief by a person of ordinary prudence in the same situation, plus a reasonable belief by such person that under such facts the claim may be valid under the applicable law." *Haswell v. Liberty Mut. Ins. Co.,* 557 S.W.2d 628, 633 (Mo. banc 1977). Thus, probable cause for a civil suit means a reasonable belief in the facts alleged, plus a reasonable belief that the claim may be valid. *Mummert,* 875 S.W.2d at 555. Proving lack of probable cause involves proving a negative, therefore, the slightest proof is all that is required to make a prima facie case. *Haswell,* 557 S.W.2d at 633; Fust v. Francois, 913 S.W.2d 38, 44 (Mo.App.1995). Where there is no dispute about the facts of a claim for malicious prosecution, the existence of probable cause is a question of law

for the court, not a question of fact for the jury. *Mummert,* 875 S.W.2d at 555; *Fust,* 913 S.W.2d at 44. However, factual disputes are for the jury to decide. *Fust,* 913 S.W.2d at 44. The defendant in a malicious prosecution action "is to be held responsible, not only for the facts he knew when he caused the suit to be instituted but also for all other facts pertinent to the suit which he could have ascertained by due diligence prior to causing the law to be put in motion." *Haswell,* 557 S.W.2d at 634. While the dismissal of a defendant's action against a plaintiff is some evidence of lack of probable cause, that alone is not sufficient basis for a conclusion of lack of probable cause. *Id.* at 633.

■ The action giving rise to plaintiffs' malicious prosecution claim is the four count petition filed by defendant on September 17, 1993 against plaintiffs alleging tortious interference with contract, defamation and slander, prima facie tort and trespass. Defendant claims that as a matter of law it had reasonable grounds to file this action because defendant reasonably believed plaintiffs were angry with defendant; defendant was informed by individuals who had a contract to purchase a home from defendant that they would not close the purchase of said home based on the statements and actions of plaintiffs; that other individuals who had a contract to purchase a home from defendant wanted to purchase a different lot and were concerned about the way defendant did business based on statements and actions of plaintiffs; and defendant was informed by another individual that plaintiffs were out to hurt defendant.

In its tortious interference, defamation, and prima facie tort counts, defendant alleged that plaintiffs intentionally interfered with the contract between defendant and the Riemer trust by making outrageous and false statements regarding safety conditions on Lot 58C, and about defendant's integrity. Defendant further alleged that plaintiffs' behavior and posture was "outrageous and menacing"; that plaintiffs intentionally interfered with defendant's contractual relationship with the Binzes by making defamatory statements regarding defendant's business, trade, profession, or office, including

statements that defendant concealed and mislead plaintiffs and others regarding the alleged health hazard of the golf balls; that defendant lacked integrity and fitness and committed misconduct in its profession; and that plaintiffs acted intentionally to cause defendant injury.

There was substantial evidence that, at the time it filed its petition, defendant knew, or should have known in the exercise of due diligence, the following: that there was in fact a hazardous golf ball problem on plaintiffs' lot; that defendant said it would not become involved in remedying it; that plaintiffs did not blame defendant for the golf ball problem; that plaintiffs complimented defendant's building practices; that the other home buyers were concerned only about golf balls coming from the neighboring golf course, not defendant; and that they did purchase homes from defendant. There was substantial evidence that neither of the plaintiffs encouraged the Riemers to breach their contract with defendant or terminate their relationship with defendant. To the contrary, the evidence shows that defendant offered to buy the Riemers out or substitute another lot on the day the Riemers first confronted defendant with the fact that John Kelley had experienced a substantial golf ball problem after defendant's president had told the Riemers there was no problem. Plaintiffs' comments that they would move if they had the chance were made to the Riemers while the Riemers were soliciting information and advice on whether to accept defendant's offer of another lot.

Likewise, there was substantial evidence that neither of the plaintiffs told the Binzes anything to discourage them from buying their property. Michael Binz testified that golf balls did not bother him and his concern about buying the property arose when defendant's sales manager told him defendant was considering suing plaintiffs. There was no evidence that plaintiffs said defendant had concealed the golf ball problem. Rather, the Riemers confronted defendant with falsely advising them there was no problem. Prior to filing its petition against plaintiffs, defendant never contacted plaintiffs to ask about their conversations with the Riemers or the Binzes. Defendant never contacted the Binzes about plaintiffs' conversations with them.

Defendant also claims in its brief it had a reasonable belief that its trespass action was valid. Defendant alleged John Kelley trespassed when he entered Lot 58C to speak with John Riemer and when he entered Lot 60C to speak with the Binzes. In both situations Kelley merely stood on ungraded land to have a conversation with the purchasers of that land. The petition did not allege any damage from these alleged trespasses but prayed for $125,000.00 in damages. There is nothing in the record to indicate that defendant had any facts which would support probable cause for pleading actual damages in this amount or any amount. *See, Fust,* 913 S.W.2d at 45.

There was substantial evidence supporting submission of the element of lack of probable cause to file the petition to the jury. The trial court did not err in denying defendant's motions for directed verdict. Point one is denied.

For its second point defendant asserts that the trial court erred in denying its motions to dismiss and for directed verdict because, as a matter of law, plaintiffs did not and could not prove that defendant's prior legal action against plaintiffs had terminated in their favor. Defendant argues that its prior action was still pending in the form of a counterclaim and plaintiffs did not offer any evidence showing that defendant had abandoned the underlying action. We disagree.

To prevail on a claim for malicious prosecution, a plaintiff must show that the underlying suit was terminated in plaintiff's favor. *Mummert,* 875 S.W.2d at 555. Termination may occur in three ways: 1) by final judgment on the merits; 2) dismissal of a cause by the court with prejudice, and 3) abandonment of the action. *Stix & Co., Inc. v. First Mo. Bank & Tr. Co.,* 564 S.W.2d 67, 70 (Mo.App.1978). When a case is dismissed without prejudice, the dismissal constitutes a termination in favor of the plaintiff, for the purpose of a subsequent malicious prosecution suit, only where the party who initiated the case manifests an intent to abandon it. *Shinn v. Bank of Crocker,* 803 S.W.2d 621,

625 (Mo.App.1990). *See also, McFarland v. Union Finance Company*, 471 S.W.2d 497, 499 (Mo.App., 1971).

■ Defendant dismissed its action against plaintiffs without prejudice. It did not institute its counterclaim against plaintiffs until after they filed their malicious prosecution action. In its answer to an interrogatory asking why defendant dismissed the underlying action, defendant answered: "Economic decision." Mark Kelly testified that the reason he did not follow through with the underlying action was that defendant had "resold Lot 58 Nantucket. Our damages weren't as high as I thought they would be.... Our losses were not that great so I didn't pursue with Kelley." Mark Kelly also testified that the "cost for me to come to court would be more than I could get out of the Kelleys for what my damages were so it wasn't worth it." Mark Kelly instructed his attorney to drop the lawsuit. Mark Kelly's attorney testified that Mark Kelly told him he only had a couple hundred dollars of damages and it was not worth his money to "pursue this thing." John Kelley testified that defendant dismissed the action on the day that plaintiffs' motion for summary judgment or dismissal was to be heard. Mark Kelly testified when plaintiffs later sued defendant, his attorney advised him to refile the original claims since "it wouldn't cost any more." There is no evidence that defendant would have resurrected its claim had plaintiffs not filed a claim for malicious prosecution.

The evidence that defendant intended to abandon the underlying action when it dismissed it without prejudice was sufficient to submit the element of prior termination in plaintiffs' favor to the jury. The trial court did not err in denying defendant's motions to dismiss and for directed verdict. Point two is denied.

■ In its third point defendant contends that the trial court erred in denying its motions to dismiss and for directed verdict on plaintiffs' malicious prosecution claim because defendant had reasonable grounds to file its petition against plaintiffs "as a matter of law." Defendant argues that the trial court affirmatively acknowledged that defendant had reasonable grounds to file its original action when it denied plaintiffs' motion for summary judgment on defendant's counterclaim and allowed defendant's counterclaim to be submitted to the jury.

Plaintiffs filed a two paragraph motion for summary judgment on defendant's counterclaim which merely stated that there were no genuine issues of material fact and they were entitled to summary judgment as a matter of law. Defendant did not respond. The trial court summarily denied the motion without explanation or findings. The trial court's action does not constitute an implied finding that defendant had, as a matter of law, established the elements of its counterclaim. It means only that plaintiffs had not established, either procedurally or substantively, a right to judgment under Rule 74.04. Similarly, allowing a claim to be submitted to the jury does not mean that it has been established as a matter of law. *See, Zahorsky v. Griffin, Dysart, Taylor, Penner*, 690 S.W.2d 144, 155 (Mo.App.1985). Point three is denied.

■ In its fourth point defendant contends that the trial court erred in denying its motions for directed verdict because plaintiffs did not offer any evidence that defendant acted with malice. Plaintiffs made a submissible case on lack of probable cause. The jury could infer malice from the lack of probable cause. *Haswell*, 557 S.W.2d at 635. Point four is denied.

■ For its fifth point defendant asserts that the trial court erred in not allowing it to introduce evidence of plaintiffs' homeowners and umbrella insurance policies because plaintiffs waived the collateral source rule when they injected their financial condition into the case. We give substantial deference to a trial court's decision on admissibility of evidence and will not disturb that decision absent a showing of abuse of discretion. *Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo. banc 1991).

■ The collateral source rule is an exception to the general rule that damages in tort should be compensatory only. *Washington by Washington v. Barnes Hosp.*, 897

S.W.2d 611, 619 (Mo. banc 1995). The rationale of the collateral source rule is that "a wrongdoer is not entitled to have the damages to which he is liable reduced by proving that plaintiff has received or will receive compensation or indemnity for the loss from a collateral source, wholly independent of him, or, stated more succinctly, the wrongdoer may not be benefitted by collateral payments made to the person he has wronged." *Id.* However, when a plaintiff injects his or her financial condition into the case before the jury, whether through inadvertence or purposefully, the opposing party is permitted to attack the plaintiff's claims of financial distress by showing that other financial assistance is available. *Id.* at 621; *Leake v. Burlington Northern R. Co.*, 892 S.W.2d 359, 363 (Mo.App.1995).

■ Prior to trial, on plaintiffs' motion in limine, the trial court excluded evidence that plaintiffs carried homeowners insurance. During the trial, John Kelley testified he was uncertain how his family would survive if builder won a judgment against them. Defendant then argued that Kelley had injected plaintiffs' financial condition in the case and made an offer of proof.

In its offer of proof, defendant established that plaintiffs had a homeowners insurance policy which included an umbrella policy for one million dollars, that plaintiffs contacted the insurer after they were sued, and that the insurer paid their attorney's fees. John Kelley testified that the insurance company would not say whether plaintiffs were covered for a judgment against them and advised him that the policies would not cover intentional acts or punitive damages. The trial court subsequently allowed defendant to question plaintiffs about the payment of attorney's fees but not insurance coverage.

Defendant argues that the existence of *potential* insurance coverage under the homeowners policy and the umbrella policy would mitigate any claimed emotional damages suffered by plaintiffs. It is difficult to fathom how plaintiffs' uncertainty over whether they had insurance coverage is a mitigating rather than an exacerbating circumstance. In any event, defendant merely established the existence of a homeowners

policy. It made no offer of proof of the contents of the policy or that the insurance would in fact cover a judgment against plaintiffs. The trial court did not abuse its discretion in excluding evidence of the insurance policies with respect to damages other than attorney's fees. Point five is denied.

### PLAINTIFFS' APPEAL

For their sole point on appeal, plaintiffs assert that the trial court erred in sustaining defendant's motion for JNOV on the trespass count because the trial court properly submitted instruction Number 22, M.A.I. 4.01, on damages for trespass. Alternatively, they contend that, even if the trial court erred in giving M.A.I. 4.01, the trial court should have granted their motion for new trial instead of entering a JNOV. Defendant responds that the JNOV is proper because plaintiffs did not offer any evidence of the amount of damages.

■ The proper measure of actual damages for trespass is the difference in the values of plaintiffs' property immediately before and immediately after the trespass or the cost of restoration, whichever is less. *Newmark v. Vogelgesang*, 915 S.W.2d 337, 339–40 (Mo.App.1996). Plaintiffs offered and the trial court gave M.A.I. 4.01 entitled "Damages—Personal and Property." M.A.I. 4.01 should only be given where there has been damage to both the person and property. *Wright v. Edison*, 619 S.W.2d 797, 801 (Mo.App.1981). Plaintiffs did not allege or offer evidence of personal injury. Accordingly, the trial court erred in submitting M.A.I. 4.01 to the jury.

■ The remedy for an erroneous jury instruction is normally a new trial, not a JNOV. *Wright*, 619 S.W.2d at 801. Had there been evidence of property damage, the case should have been submitted on M.A.I. 4.02, for property damage only, which defines damages as the difference between the fair market value of the property before it was damaged and the fair market value after. However, in this case plaintiffs did not introduce any evidence to support a submission of actual damages under M.A.I. 4.02. There was no evidence of the values of their property immediately before and after the trespass

or of the cost of restoring their land to its prior condition. They are, therefore, not entitled to a new trial on actual damage. However, because substantial evidence supports the jury's finding that defendant trespassed on plaintiffs' property, plaintiffs are entitled to nominal damages from the trespass. *Vecchiotti v. Tegethoff,* 745 S.W.2d 741, 744 (Mo. App.1987).

The judgment of the trial court on the malicious prosecution counts is affirmed. The JNOV on the trespass count is reversed and remanded to the trial court with directions to enter judgment in plaintiffs' favor on that count in the amount of $1.00.

GERALD M. SMITH and PUDLOWSKI, JJ., concur.