In re BLACKWELDER FURNITURE
COMPANY OF STATESVILLE, INC.,
and its Subsidiaries, Debtor.

Bankruptcy No. ST–B–79–119.
Adv. Nos. 82–0141, 82–0236, 82–0263, 82–
0325, 82–0333, 82–0336, 82–0374, 82–0377,
82–0378, 82–0508, 82–0514, 82–0544 and
82–0604.

United States Bankruptcy Court,
W.D. North Carolina.

July 21, 1983.

J. Samuel Gorham, III, Hickory, N.C.,
Trustee for Blackwelder Furniture.

W. Benjamine Hawfield, Jr., Charlotte,
N.C., for NCNB, NCNB Mortgage Corp.

Robert Lindsey, Jr., Nelson M. Casstevens, Jr., Charlotte, N.C., for International Trading and Investment, Ltd. and Omar Bakir.

James Frenzel, Winston-Salem, N.C., for Thomasville Furniture.

Lloyd F. Baucom, Charlotte, N.C., for General Electric Credit Corp. of Georgia.

MEMORANDUM OF DECISION
AND ORDER

MARVIN R. WOOTEN, Bankruptcy Judge.

This Memorandum of Decision and Order is filed in connection with thirteen identical crossclaims filed by the Trustee against NCNB National Bank of North Carolina ("NCNB," formerly North Carolina National Bank) in the adversary proceedings listed above. The Trustee and NCNB are co-defendants in the listed adversary proceedings, all of which were originally brought by parties not participating in the present matter. In each such adversary proceeding the Trustee crossclaimed against NCNB seeking a determination of NCNB's status as an alleged secured creditor of the Debtor. In addition to the Trustee and NCNB, International Trading and Investment Company, Ltd. ("ITI"), also a co-defendant of the Trustee and NCNB in the adversary proceedings, has appeared and participated in both hearings. ITI claims an interest in the subject matter of the Trustee's crossclaims by virtue of its own claim to secured status.

In this Chapter 7 case NCNB has filed a proof of claim for $151,690.20, together with additional interest and other charges, such as attorneys' fees, which may have accrued after the date of its proof of claim (July 13, 1982). NCNB contends that its claim is secured by a first priority security interest in the Debtor's inventory pursuant to a security agreement dated August 31, 1978. NCNB claims as additional security for its claim a second mortgage on certain real property owned by the Debtor, pursuant to a deed of trust dated August 31, 1978, as well as a second priority security

interest in the Debtor's office furniture, equipment and fixtures, also pursuant to a security agreement dated August 31, 1978.

The Trustee's crossclaims came before the Court on November 30, 1982, and again on June 30, 1983, for hearing on stipulated facts and on certain issues designated by the parties. In particular, the parties have asked the Court to determine whether NCNB's claim is secured by inventory (and proceeds of such inventory) acquired by the Debtor *after* December 7, 1979, the date on which the Debtor filed its Chapter 11 petition, or whether NCNB's security interest in inventory is limited to inventory owned or acquired by the Debtor prior to the filing of the Chapter 11 petition on December 7, 1979, and to the traceable proceeds of such inventory. This issue has been extensively briefed and argued by the parties and is ripe for decision. Resolution of the issue requires a consideration of the terms of the Debtor's plan of reorganization, confirmed on April 17, 1980, as those terms interact with the provisions of 11 U.S.C. § 552(a) and 11 U.S.C. § 1124.

A brief recitation of the history of the case sets the stage. The Debtor filed its Chapter 11 petition on December 7, 1979, and a plan of reorganization was filed soon afterward on February 27, 1980. The plan was confirmed on April 17, 1980, and the reorganized Debtor resumed operations under the plan, subject to certain retention of jurisdiction by the Court. The Debtor continued operations under the plan until it converted the case to Chapter 7 on January 27, 1982. The Trustee was appointed shortly after conversion and has since proceeded to liquidate the Debtor's assets. As a result of several public sales the Trustee now holds funds representing the proceeds of inventory owned or held by the Debtor on January 27, 1982, which are substantially in excess of any amounts needed to satisfy NCNB's claim *if* NCNB's security interest attaches to inventory and proceeds of inventory acquired by the Debtor after the filing of the original Chapter 11 petition.

Certain facts are not in dispute among the parties. The parties do not dispute that the security interest in inventory created by NCNB's August 31, 1978, security agree-ment was properly perfected or that the security agreement contained an otherwise valid and enforceable provision granting to NCNB a security interest in the Debtor's then-existing and after-acquired inventory. The security interest created was, in commercial terms, a standard "floating lien" on inventory. Nor do the parties dispute that the operation of this provision was suspended upon the filing of the Chapter 11 petition and according to the provisions of 11 U.S.C. § 552(a), which provides in pertinent part:

> Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

Nothing else appearing, the impact of this provision of the Code would be to confine NCNB's security interest in inventory to inventory owned or acquired by the Debtor prior to the filing of its Chapter 11 petition on December 7, 1979. The parties do not dispute that this date is the date of the "commencement of the case" for purposes of applying § 552(a) and that the conversion of the case to Chapter 7 did not effect any change in the relevant date. See 11 U.S.C. § 348(a). Finally, the parties also do not dispute that the value of the Debtor's pre-petition inventory on hand in the Debtor's warehouses and showrooms was at all times from the filing of the Chapter 11 petition through the date of confirmation of the plan of reorganization on April 17, 1980, sufficient fully to secure NCNB's claim (as it stood on December 7, 1979) many times over and still leave substantial excess value for the Debtor and the estate.

As noted in § 552(a) and pursuant to 11 U.S.C. § 552(b), NCNB's security interest would also extend to the traceable proceeds of the Debtor's pre-petition inventory, but the parties have reserved for the present the question whether or not NCNB could successfully trace now, over three years later, the proceeds from inventory owned or acquired by the Debtor prior to the filing of its petition.

The dispute among the parties concerns the effect of the Debtor's confirmed plan of reorganization on the operation of § 552(a) and specifically whether NCNB's security interest in after-acquired inventory was revived and reinstated by the plan of reorganization. The parties do not dispute that under the Debtor's plan NCNB was classified as a Class 1 creditor, which class was defined in the plan as follows:

> Secured claims as such claims existed on the date of the petition in this case as finally allowed and approved by the Court, and to the extent that such claims do not exceed the value of those assets of the Debtor which the Court finds are valid security for such claims.

There is no dispute among the parties that on the date of the Chapter 11 petition NCNB had a valid and properly perfected security interest in inventory of the Debtor of a value sufficient to fully secure the claim.

Treatment of Class 1 creditors was spelled out in Article II of the plan as follows:

> Classes 1, 2, 4, and 5 shall remain unaltered and are not impaired under the Plan.

The parties do contend for differing interpretations of this provision proposing to treat NCNB and other Class 1 creditors as "unaltered and not impaired." NCNB argues that, given the definition of "impairment" in 11 U.S.C. § 1124, the correct reading of this plan section necessarily includes a ratification and revival of its rights under the pre-petition security agreement, including the contract provision granting it a security interest in after-acquired inventory. The Trustee and ITI, on the other hand, argue that the meaning of the term "impairment" in the plan and in § 1124 of the Code is necessarily dependent on and limited by the operation of other sections of the Code, including § 552(a).

Section 1124(1) of the Code provides in pertinent part:

> ... [A] class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—

> (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest;

> (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

> (A) cures any such default, other than a default of a kind specified in section 365(b)(2) of this title, that occurred before or after the commencement of the case under this title; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.....

(For reasons not necessary to discuss here, the Debtor's plan did not treat NCNB as unimpaired in the alternative manner set out in § 1124(3).)

The core meaning of § 1124(1) and (2) is that defaults, if any, in the Debtor's agreements with the unimpaired creditor are cured and the unimpaired creditor retains all his "legal, equitable and contractual" rights against the Debtor. The parties here differ on whether or not the bundle of rights possessed or retained by the unimpaired creditor include such rights as he possessed prior to the commencement of the case or only such rights as he possessed at the instant of filing or immediately after the filing of the petition, as such rights had been limited by the operation of § 552(a) and other sections of the Code. In other words, may a creditor be left unimpaired *by the plan,* in the senses set out in § 1124, even though as a result of the filing of the petition and the operation of other sections of the Code he has lost certain rights or

remedies he possessed prior to the commencement of the case?

The issue thus put is, as far as the Court knows, one of first impression.*

However, the Court is not entirely without guidance in approaching the question. In the analysis of § 1124 and the concept of impairment contained in S. 2266 (which is not materially different, for present purposes, from 11 U.S.C. § 1124 as subsequently enacted), the Report of the Senate Committee on the Judiciary noted:

> ... [A] claim or interest is unimpaired by curing the effect of a default and reinstating the *original terms* of an obligation when maturity was brought on or accelerated by the default. The intervention of bankruptcy and the defaults represent a *temporary crisis* which the plan of reorganization is intended to clear away. The holder of a claim or interest who under the plan is restored to his *original position,* when others receive less or get nothing at all, is fortunate indeed and has no cause to complain.

S.Rep. No. 95–989, (95th Cong., 2d Sess. 120 (1978), U.S.Code Cong. & Admin.News, pp. 5787, 5906.) (Emphasis added). The Court believes that the "original position" of a creditor can only refer to his pre-petition position and not to the position he might have occupied *vis-a-vis* the debtor and the debtor's property after the intervention of the "temporary crisis" of bankruptcy.

This interpretation of the relationship between § 1124 and § 552(a) is also in accord with the intent of the plan in this case as gathered from the four corners of the document. In addition to the portions of the plan already quoted, the discussion of the means for execution of the plan in Section VII is highly significant:

> With the approval of the Court and the consent of the Creditors' Committee, the Debtor has entered into a funding agreement dated February 27, 1980, with In-

ternational Trading and Investment Company, which provides for the placing of certain funds as a good faith deposit to guarantee distribution to Class 3 creditors as herein provided for, and that the Plan and funding agreement will be implemented in accordance with their terms. The Debtor will retain all of its property. *Any defaults existing with regard to Security Agreements held by Class 1 creditors shall be cured and all of the other terms and provisions of such contracts shall remain in full force and effect.* Pursuant to the terms of the funding agreement and the order of the Court approving said agreement, International Trading and Investment Company shall advance the funds necessary to implement the Plan of Reorganization and shall receive a security interest in the assets of Blackwelder Furniture Company, Inc., junior to existing security interest as well as treatment as an administrative expense for all funds advanced.

Language in the Funding Agreement referred to and incorporated by reference in the plan is consistent with the quoted provision from Section VII of the plan. (International Trading and Investment Company referred to in the quoted portion of the plan is the same as ITI, the party to this proceeding.)

From this language the Court can only conclude that the intent of the plan and its express provisions provide for the ratification of *all* the terms and conditions contained in the NCNB's pre-petition security agreement, including the provision granting a security interest in after-acquired inventory. While the plan did not expressly mention the after-acquired property clause, it also did not expressly mention any other particular provision of those security agreements, but the Court cannot find any basis in the plan for inferring any

* The only judicial discussion related to this issue and known to the Court and is dictum contained in a footnote in *In Re BBT,* 11 B.R. 224, 7 B.C.D. 769, 772 n. 12 (Bkrtcy.D.Nev.1981), where the Court commented on an analogous question—the interaction between § 1124 and § 502(b)(2)—as follows: "Generally there is no

post-petition interest in an undersecured secured claim [11 U.S.C. 502(b)(2)]. The additional interest *is* of consequence when the debtor wishes to treat the claim as unimpaired [11 U.S.C. 1124(1)] in a plan. Otherwise, the terms in a plan, *if* confirmed, are substituted for the impaired terms."

limitation on the generality of the wording used in Section VII.

The Court believes that its construction of the plan and its interpretation of § 1124 is consistent with the overall scheme of the Code. Were the Court to rule otherwise in this case and hold that a creditor could lose significant rights as a result of the operation of § 552(a) and yet come through a reorganization "unimpaired" within the meaning of § 1124, strange consequences could result. A creditor with a "floating lien" on inventory (or similar collateral) could enter a reorganization proceeding well-secured and protected by a large cushion of surplus collateral. Such a creditor might find that it had no basis during the pendency of the reorganization for seeking "adequate protection" of its interest in the collateral because it was at all times protected by this equity cushion in the pre-petition collateral. (The parties do not dispute that in this case NCNB was substantially oversecured, measured against pre-petition inventory levels, at all times from the commencement of the Chapter 11 case through the confirmation of the plan of reorganization.) The creditor might then come to the point where a plan has been proposed to learn that it was classified as "unimpaired" and thus not entitled to vote on the plan because, pursuant to § 1126(f), it would be deemed to have accepted the plan. Because it was deemed to accept the plan the creditor would also find that it could invoke none of the protections afforded objecting creditors and classes under 11 U.S.C. § 1129(a)(7) and § 1129(a)(9). The creditor would come away from the confirmation technically "unimpaired" but having been deprived of its after-acquired property security interest by virtue of the operation of § 552(a). Furthermore, so long as the reorganized debtor made payments to the secured creditor after confirmation according to the terms of the original debt instrument defining their relationship, there would be no default and thus no basis for the creditor to proceed against its remaining collateral. The debtor, meanwhile, could freely dispose of such collateral without replacing it with new collateral, with the result that the hapless creditor who went into the reorganiza-

tion over-secured could find itself completely unsecured long before its debt was paid in full. The Court believes that this train of consequences, which is consistent with and even likely under the interpretation of "impairment" contended for by the Trustee and ITI, is not consistent with the overall thrust of the Code's provisions for participation by creditors in reorganization proceedings and for protection of secured creditors against loss of their rights.

The Court is less clear, however, on whether the force of the plan of reorganization and § 1124 is to revive NCNB's after-acquired property lien effective as of the date of the petition or only effective as of the date of confirmation of the plan. In view of the short time between the petition and confirmation in this case, this may be an issue without any practical difference. The parties are accordingly requested to advise the Court whether they perceive that the choice of dates will affect the ultimate outcome.

## II.

NCNB has separately moved that if the Court should find that the plan of reorganization did not itself operate to reinstate its after-acquired property security interest, then the Court enter an order *nunc pro tunc* and pursuant to the provisions of 11 U.S.C. § 1142(b), reinstating the after-acquired property security interest effective at least from the date of confirmation of the Chapter 11 plan. NCNB argues that since the case which was commenced on December 7, 1979, has not yet been closed pursuant to 11 U.S.C. § 350(a), the Court retains the power under § 1142(b) and notwithstanding the conversion of the case to Chapter 7 on January 27, 1982, to issue orders in aid of the implementation of the plan of reorganization. In this connection NCNB has sought to offer evidence which, if believed, would tend to show that the parties involved in the Chapter 11 reorganization proceeding intended and agreed that the position of NCNB *vis-a-vis* the reorganized Debtor would continue as it had before the filing of the petition and that NCNB's pre-petition

"floating lien" on inventory would continue intact after confirmation. The Court is of the opinion that its authority under the Code provisions relied on by NCNB is not broad enough to permit the relief sought by NCNB, and that if the plan itself does not suffice to reinstate NCNB's "floating lien" on inventory, then the practical effect of the alternative motion filed by NCNB is to seek a *modification* of the plan without conforming to the requirements for a post-confirmation modification set out in 11 U.S.C. § 1127. The Court also notes that the relief requested by NCNB's alternative motion is unnecessary in view of the Court's ruling that the plan of reorganization as confirmed does in fact revive NCNB's "floating lien" on inventory.

### III.

In accord with the foregoing discussion, IT IS ORDERED that NCNB's claim filed on July 13, 1982, shall be allowed as a secured claim up to the value of the inventory (or its proceeds) owned or acquired by the Debtor on or before December 7, 1979, or owned or acquired by the Debtor on or after April 17, 1980, and prior to the date of conversion of the case to Chapter 7. The Court reserves ruling at this time on whether the claim shall be treated as secured to the extent of the value of inventory (or its proceeds) acquired by the Debtor after the filing of the Chapter 11 petition and prior to confirmation of the plan of reorganization on April 17, 1980. The parties are further directed to advise the Court within 60 days as to any other issues still in dispute on the Trustee's crossclaims so that those matters may be heard and determined and a final order entered on such crossclaims.