# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2968

_____

JCB, Inc.,                            *

                                  *

        Plaintiff - Appellee,         *

                                  *

    v.                               *

                                  *    Appeal from the United States

Union Planters Bank, NA,         *    District Court for the Eastern

                                  *    District of Missouri.

        Defendant - Appellant,     *

                                  *

Machinery, Inc.,                  *

                                  *

        Defendant.                *

_____

Submitted: April 14, 2008
Filed: August 26, 2008 (Corrected August 27, 2008)

_____

Before MURPHY, COLLOTON, and SHEPHERD, Circuit Judges.

_____

MURPHY, Circuit Judge.

JCB, Inc. brought this action against Union Planters Bank, N.A. (Bank) seeking a declaratory judgment and damages for trespass and conversion for unilateral removal and sale of equipment which had been purchased by their debtor, Machinery, Inc. and was subject to their competing security interests. The district court referred some of the issues in dispute to the bankruptcy court which determined that JCB had the senior security interest in the equipment and granted it partial summary judgment.

Issues of damages were tried to a jury in the district court, resulting in a verdict in favor of JCB. The jury awarded JCB $1,446,500 in compensatory damages and $1,150,000 in punitive damages for conversion, as well as $1 compensatory and $1,087,500 punitive damages for trespass. After denying the Bank's post trial motions, the district court entered judgment for JCB in the amount of the jury verdict. The Bank appeals. We affirm in part and reverse in part.

## I.

Both JCB and the Bank were creditors of Machinery, Inc. (Machinery). JCB manufactures and distributes heavy equipment, such as backhoe loaders and excavators, as well as parts. Machinery was an authorized dealer of JCB products in St. Louis, Missouri. Under their 1996 dealership agreement and inventory security agreement, Machinery received JCB equipment, machines, and parts on credit as part of a floorplan financing arrangement. In return, Machinery granted JCB a purchase money security interest in the equipment, including any which Machinery might acquire after the agreements were signed.[1] As a result of a line of credit extended to Machinery in 2000 the Bank obtained a security interest in Machinery's inventory and accounts and certain other items. While the Bank made no new loans to Machinery after 2001 and the principal and interest on its loan had been fully paid off by July 2003, Machinery still had contingent obligations to it related to another lawsuit.

---

[1]The key clause reads: "[Machinery] hereby grants, sells, assigns, conveys and confirms to JCB a security interest in inventory consisting of new and used equipment, machines, products, attachments and parts manufactured or sold by JCB or carrying the JCB name or identification mark now or hereafter acquired by [Machinery] from JCB and with respect to which the purchase price, finance charges or any other related sums shall not have been paid in full in cash" and "in all proceeds . . . related to the foregoing."

Machinery ran into financial trouble and filed a voluntary Chapter 11 bankruptcy petition in 2001. The bankruptcy court confirmed Machinery's plan for reorganization later that year.[2] While Machinery was in bankruptcy, JCB continued to sell it inventory under the original floorplan financing arrangement and previous security agreement; no separate security agreement was executed after the Chapter 11 proceedings were initiated. In 2003 Machinery encountered further financial difficulties and could not make scheduled payments to JCB for inventory it purchased on credit, but JCB continued to provide it current model equipment and parts so that Machinery could service its customers. In March 2003 representatives of Machinery and JCB decided to move the remaining JCB equipment to a lot which JCB leased adjacent to Machinery's premises. Other rental equipment subject to JCB's security agreement was placed on this lot as it was returned. JCB's lot was fenced with gates which were supposed to be locked at all times, but a Machinery representative had a key to one of the gates and limited authority to enter the lot to show machines to prospective customers and to return rented equipment.

Machinery eventually decided to close down its business, and on April 29, 2003 a meeting of its major secured creditors was held on its premises to announce that it would be ceasing operations. The Bank, JCB, and Machinery were all represented at the meeting. At the time of the meeting, the huge yellow equipment which had been moved onto JCB's adjacent lot was visible through the fencing, but neither the Bank nor Machinery raised any objection to its separation. The Bank later explained that only after the meeting had it learned that JCB had financed equipment purchase by Machinery subsequent to the confirmation of its reorganization plan.

The Bank decided to repossess equipment Machinery had obtained from JCB and it hired ATEC, Inc. for the job. ATEC had been serving as the liquidating agent for Machinery, and on May 9, 2003, ATEC entered JCB's lot without notice or

---

[2]The bankruptcy case finally closed in June 2006 after it was fully administered.

advance authorization and removed 23 machines from it. All of this equipment had been purchased by Machinery from JCB on credit after confirmation of its Chapter 11 plan.

The Bank chose to sell the 23 pieces of equipment ATEC had seized along with other Machinery collateral at a public liquidation auction. It notified JCB and other creditors of its plan on June 12, 2003. JCB responded on July 2 with a written proposal to sell the equipment in which it claimed a security interest through its dealership system. Its proposal was not accepted by the Bank. On July 15 two days before the auction, JCB sent a letter demanding that the Bank remove its equipment from the auction and return it. This letter also stated that JCB asserted a first priority purchase money security interest in the machines and disputed the Bank's claim to them. ATEC nevertheless proceeded with the auction on behalf of the Bank as originally scheduled, and around $839,000 was obtained for the equipment. Although there were varying estimates, there was testimony at trial that the equipment had a fair market value of about $1.1 million. The Bank eventually placed the proceeds from the equipment in a noninterest bearing account mingled with proceeds from other collateral; it subsequently withdrew some of the money to cover Machinery's obligations to the Bank, including attorney fees for a separate action.

JCB filed this action against the Bank and Machinery in September 2003, seeking a declaratory judgment that it had a security interest in the equipment which was senior to the interests of the Bank and Machinery, and also asserting claims in trespass and conversion. The Bank counterclaimed on four counts, requesting a declaratory judgment that it held the senior security interest in the collateral. The district court referred the matter to the bankruptcy court for determination under Machinery's reorganization plan of the relative priorities of its creditors' secured interests. The Bank moved unsuccessfully for summary judgment, and JCB moved for partial summary judgment on its own claims and on the Bank's counterclaims. The bankruptcy court determined that both the Bank and JCB had perfected security

interests in the collateral, but that JCB's lien was senior because Machinery's reorganization plan preserved JCB's prepetition purchase money security interest in the equipment Machinery acquired after confirmation of the plan.

The district court held a jury trial on the issue of damages. The jury was instructed on both trespass and conversion, and the verdict form had separate sections for each tort with separate lines for compensatory and punitive damages. For the Bank's conversion of JCB's equipment, the jury awarded JCB $1,446,500 in compensatory damages based on its fair market value (which included $346,500 in interest) and $1,150,000 in punitive damages. The district court directed the jury to award $1 in compensatory damages on JCB's trespass claim since the fair market value of the land had not been diminished by the trespass; the parties agreed that that amount was appropriate. The jury awarded JCB $1,087,500 in punitive damages for the Bank's trespass. The Bank filed post trial motions for judgment as a matter of law, a new trial, and remittitur of the damages. The district court denied the motions and ordered that judgment be entered for JCB in the amounts awarded by the jury; the judgment lists the amounts awarded for trespass and conversion separately.

The Bank appeals from the judgment, arguing that it had the senior security interest in the collateral as a matter of law and that it could therefore not have been liable for trespass and conversion. The Bank further contends that JCB was not entitled to punitive damages and that the amount awarded was excessive and unreasonable. It also challenges the interest award. JCB urges us to affirm in all respects.

## II.

The Bank argues that the bankruptcy court erred as a matter of law in granting JCB's motion for partial summary judgment. It attacks the determination that JCB had the senior interest in the collateral and argues that it was not liable for conversion and

trespass. JCB disagrees, arguing that the bankruptcy court correctly determined that it had the senior security interest in the equipment under the reorganization plan and that the Bank was liable for conversion and trespass.

While we normally review a bankruptcy court's legal conclusions de novo, Neal v. Kansas City Star (In re Neal), 461 F.3d 1048, 1052 (8th Cir. 2006), its interpretation of the confirmed plan is entitled to deference as an interpretation of its own order and "should be reviewed under the abuse of discretion standard." Gen. Elec. Capital Corp. v. Dial Bus. Forms, Inc. (In re Dial Bus. Forms, Inc.), 341 F.3d 738, 744 (8th Cir. 2003). Acting on a reference from the district court, the bankruptcy court concluded here that Machinery's reorganization plan gave JCB the senior security interest in post confirmation assets purchased under the JCB financing and security agreements, including the 23 pieces of equipment on the fenced lot. The court reasoned that § 3.4.14.b of the reorganization plan preserved JCB's prepetition lien on the collateral and that no other provision of the plan eliminated that interest.[3] The district court agreed with the bankruptcy court and determined that JCB had the senior lien in the collateral and that the Bank had trespassed on JCB's lot and converted its equipment.[4]

---

[3]Section 3.4.14.b provides: "Except for the change in interest rate, monthly payments, 'release prices' and reamortization proposed to occur following an authorized collateral sale and application of proceeds as provided in the Plan, *all terms and conditions of the prepetition documents executed by the Debtor shall remain in full force and effect*." (Emphasis supplied). "Debtor" was defined in the plan to mean Machinery, Inc., the Debtor and Debtor in Possession.

[4]Conversion is the "unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights." Carter v. White, 241 S.W.3d 357, 362 (Mo. Ct. App. 2007) (per curiam) (quotation omitted). Trespass is the "unauthorized entry by a person upon the land of another, regardless of the degree of force used, even if no damage is done, or the injury is slight." Ogg v. Mediacom, L.L.C., 142 S.W.3d 801, 807 (Mo. Ct. App. 2004) (quotation omitted).

-6-

We review de novo the district court's denial of the Bank's motion for judgment as a matter of law, drawing "all reasonable inferences in favor of the nonmoving party without making credibility assessments or weighing the evidence." Arabian Agric. Servs. Co. v. Chief Indus., Inc., 309 F.3d 479, 482 (8th Cir. 2002) (quotation omitted). Judgment as a matter of law is appropriate if "the responding party has been fully heard on an issue and a reasonable jury would not have a legally sufficient basis to find for that party on that issue." Dominic v. DeVilbiss Air Power Co., 493 F.3d 968, 974 (8th Cir. 2007); see Fed. R. Civ. P. 50(a)(1).

Once confirmed, a Chapter 11 plan acts as both a contract which binds the parties and as an order of the bankruptcy court. In re Dial Bus. Forms, 341 F.3d at 744. Confirmation of the reorganization plan replaces prior obligations, id. at 742 n.3, and a lien not preserved by the plan may be extinguished. See FDIC v. Union Entities (In re Be-Mac Transp. Co., Inc.), 83 F.3d 1020, 1025-26 (8th Cir. 1996); Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.), 519 F.3d 640, 648 (7th Cir. 2008) ("[D]efault rule" is that "if a secured creditor participates in the debtor's bankruptcy and the ultimate plan does not preserve the creditor's interest, the interest is gone."); see also 11 U.S.C. § 1141(c). A plan can, however, "'expressly preserve preexisting liens.'" In re Dial Bus. Forms, 341 F.3d at 743, quoting In re Penrod, 50 F.3d 459, 462 (7th Cir. 1995). A security interest preserved by the plan will continue after confirmation. See 11 U.S.C. § 1141(c).

The Bank argues that JCB did not have a secured interest in the equipment because Machinery's Chapter 11 plan did not specify that JCB had an interest in the collateral of the reorganized debtor and JCB did not enter into any new security agreements with Machinery after confirmation of the plan. The Bank suggests that

under 11 U.S.C. §§ 552(a)[5] and 1141(c)[6] collateral acquired after plan confirmation is free of any liens except as explicitly provided for in the plan. JCB responds that § 1141(c) specifically provides that a reorganization plan can preserve security interests even though they would otherwise be eliminated by confirmation and that this was done here. It also asserts that § 552(a) does not apply after a plan has been confirmed and that it does not override the terms of a confirmed plan. See Kucera v. Bank of Brainard, 123 B.R. 852, 854 (Bankr. D. Neb. 1990) ("§ 552 simply suspends operation of an after acquired property clause during the pendency of the bankruptcy case"); In re Blackwelder Furn. Co., 31 B.R. 878, 881-82 (Bankr. W.D. N.C. 1983).

Machinery's reorganization plan expressly provided in § 3.4.14.b that "all terms and conditions of the pre-petition documents executed by the Debtor shall remain in full force and effect." Under this section of the plan, the subsequently acquired property clause in JCB's financing and security agreements survived confirmation. JCB therefore had a security interest in the collateral under the agreements. See In re Blackwelder Furn., 31 B.R. at 881-82; cf. In re Dial Bus. Forms, 341 F.3d at 743 (plan preserved creditors' security interests and defined their relative post bankruptcy priority). Moreover, JCB had a perfected purchase money security interest in the equipment, and § 3.7 of Machinery's reorganization plan provided that the Bank's first priority secured position would be junior to any "properly perfected purchase money security interests in Debtor's [Machinery's] equipment and inventory."

---

[5]Section 552(a) provides that subject to certain exceptions "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."

[6]Subject to exceptions not material here, section 1141(c) states "*except as otherwise provided* in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor." (Emphasis supplied).

The Bank claims that it was the only secured creditor with an interest in the post confirmation collateral under Machinery's Chapter 11 plan, pointing to § 3.7 and other sections of the plan. Section 3.7 addresses the property of the reorganized debtor and states in part: "[o]ther than [the Bank], with respect to all assets, and other than any secured creditor, with respect only to specific items and accounts receivable stemming from the sale but not the lease or rental of any collateral on which it holds a properly perfected security interest, no party shall hold any security interest in any property of the reorganized debtor." The Bank interprets this section to mean that other secured creditors only received security interests in collateral existing at the time the plan was put in place. This reading is not supported by the text in § 3.7, however, which plainly protects some perfected security interests of "any secured creditor" in "specific items" and some "accounts receivable." The Bank also contends that §§ 2.11 and 3.4 of the plan limit JCB's interests to prepetition collateral. While those sections establish JCB's secured claim against Machinery's estate, they simply do not address its interest in the reorganized debtor.

We conclude that JCB had the senior security interest in the collateral under the terms of Machinery's reorganization plan. Cf. In re Dow Corning Corp., 456 F.3d 668, 676 (6th Cir. 2006) (confirmed plan to be interpreted using contract principles and unambiguous plan terms are to be enforced as written); accord In re Dial Bus. Forms, Inc., 283 B.R. 537, 541 (8th Cir. BAP 2002). The Bank's objections to the findings that it was liable for trespass and conversion rest on its premise that it had the senior or sole security interest in the collateral. Because we reject that theory, the Bank cannot prevail on its arguments that it was permitted by virtue of its own security interest to enter onto JCB's lot, remove the collateral, and possess the equipment under Missouri law. Accordingly, the district court did not err by denying the Bank's motion for judgment as a matter of law.

III.

Although the Bank does not challenge the $1,100,000 in compensatory damages for conversion or the $1 nominal damages for trespass, it raises multiple objections to the punitive damages awarded to JCB: $1,087,500 for trespass and $1,150,000 for conversion. JCB answers that it presented sufficient evidence to support the submission and award of punitive damages, and that the amounts of the punitive damages awards do not violate the Bank's due process rights.

A.

The Bank's objects to the district court's submission of the issue of punitive damages to the jury, and we review this decision for abuse of discretion. See Diesel Machinery, Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 837 (8th Cir. 2005). Punitive damages are available for the torts of trespass and conversion under Missouri law, see Wright v. Edison, 619 S.W.2d 797, 803 (Mo. Ct. App. 1981); Dayton Constr., Inc. v. Meinhardt, 882 S.W.2d 206, 209 (Mo. Ct. App. 1994), but must be shown by clear and convincing evidence. See, e.g., Perkins v. Dean Machinery Co., 132 S.W.3d 295, 299 (Mo. Ct. App. 2004), citing Rodriguez v. Suzuki Motor Corp., 936 S.W.2d 104, 111 (Mo. banc 1996). A submissible case for punitive damages is made if the "evidence and the inferences drawn therefrom are 'sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity – that is, that it was highly probable – that the defendant's conduct was outrageous because of evil motive or reckless indifference'" to the rights of others. Perkins, 132 S.W.3d at 299 (citation omitted); see also Blue v. Harrah's North Kansas City, LLC, 170 S.W.3d 466, 477 (Mo. Ct. App. 2005).

Under Missouri law, if a "trespass is intentional and done without cause or excuse, it is willful and warrants a submission of punitive damages," even if the defendant acted under a mistaken belief of law or fact. Wright, 619 S.W.2d at 803.

-10-

The Bank had ATEC enter JCB's fenced lot without permission. Neither the Bank nor ATEC contacted JCB for authorization to enter the lot or to notify it of the entry, even though ATEC was aware that JCB was renting the lot and a representative of the Bank stated in his deposition that he "presume[d]" the machines had been moved there "by or for the benefit of JCB." The lot was protected by a fence with locking gates and was obviously not open to the public. The Bank's officer in charge of this matter testified at trial that he knew of the option of trying to obtain a replevin order from a court before a repossession but chose not to seek such an order in this case. As the trespass was willful, the issue of punitive damages could be submitted to the jury irrespective of the Bank's mistaken belief that it had a superior interest allowing it to enter the fenced lot to repossess the machines, id., and was not an abuse of discretion.

Trial evidence also supported the submission of punitive damages to the jury on JCB's conversion claim. The Bank received JCB's demand letter and suggestions for alternative ways of selling the equipment prior to the public auction arranged by the Bank. JCB's communications put the Bank on notice that JCB claimed rights in the collateral, yet it chose to proceed with the sale anyway. There was evidence that the Bank's officer in charge of this matter knew there were other means to take possession of the machines which would have protected JCB's rights but chose not to use them. Testimony indicated that the Bank's decision to proceed with the liquidation auction resulted in the sale of the equipment for less than full value. After the auction, the Bank knew that JCB disputed its right to the proceeds of the collateral. Yet it did not place the funds under joint control or in an escrow account. Because this evidence indicated with sufficiently high probability that the Bank seized and sold the machines with reckless disregard for JCB's rights in them, the district court did not abuse its discretion in submitting the issue of punitive damages for conversion.

The Bank next asserts that it was entitled to judgment as a matter of law on punitive damages because JCB did not meet its burden to show by clear and

convincing proof that it had a culpable state of mind. Reviewing de novo, see Dominic, 493 F.3d at 974, we disagree. Although a punitive damages award may be reversed on appeal under Missouri law if there is no evidence of evil motive or reckless indifference, see Walker v. Gateway Nat'l Bank, 799 S.W.2d 614, 617 (Mo. Ct. App. 1990), we will not lightly overturn a jury verdict unless there is a complete absence of probative facts and no proof beyond speculation to support that verdict. See Wedow v. Kansas City, 442 F.3d 661, 669 (8th Cir. 2006). A reasonable jury could have credited JCB's evidence that the Bank acted with reckless indifference to its rights in the land and in the collateral, and an evil motive may be inferred from such evidence. See Walker, 799 S.W.2d at 617, citing Burnett v. Griffith, 769 S.W.2d 780, 789 (Mo. banc 1989). The district court therefore did not err in denying the Bank's motion for judgment as a matter of law.

The Bank further claims that the punitive damages should be vacated based on its good faith belief that its actions complied with the law. It is true that when a defendant "acts in good faith and honestly believes that his act is lawful," he is not liable for punitive damages under Missouri law. Hostler v. Green Park Dev. Co., 986 S.W.2d 500, 507 (Mo. Ct. App. 1999). The Bank presented evidence at trial about its efforts to investigate JCB's security interest prior to seizing the machines and the conclusion it drew that JCB did not have a security interest in the post confirmation collateral. The Bank's counsel reviewed these matters in its closing argument and urged the jury not to award punitive damages to JCB. Simply presenting such evidence of good faith to the jury does not immunize a defendant from punitive damages, however, because the jury may believe or disbelieve such evidence like any other. See Young v. Mercantile Trust Co. Nat'l Ass'n, 598 S.W.2d 482, 483 (Mo. Ct. App. 1980); see also Ryther v. KARE 11, 108 F.3d 832, 845 (8th Cir. 1997) (en banc). The jury's decision to assign punitive damages to JCB for both trespass and conversion was supported by evidence that the Bank committed the torts with the requisite state of mind. It is the jury's role to evaluate that evidence and decide what inferences should be drawn from it, see Brown v. Sandals Resorts Int'l, 284 F.3d 949,

954 (8th Cir. 2002), and we see no reason to vacate the jury's verdict based on the Bank's renewed assertions of its good faith.

## B.

The Bank next contends that the punitive damage awards are so high as to violate its due process rights; JCB denies this assertion. On its conversion claim the jury awarded JCB $1,100,000 compensatory damages, $346,500 in compensatory interest, and $1,150,000 in punitive damages. For trespass, JCB and the Bank agreed that $1 was the appropriate amount for actual damages, and the district court instructed the jury to assess that amount and itself entered $1 on the verdict form. For punitive damages on the trespass claim the jury additionally awarded $1,087,500.

The district court submitted separate punitive damages instructions for trespass and conversion, and the jury accordingly considered them individually. The verdict form was divided into different sections for each tort. There were separate blanks for punitive damages for each tort, which the jury filled in with separate amounts of punitive damages for trespass and conversion. When it came to reviewing the constitutionality of the punitive damages awards after trial, however, the district court decided to consider the punitive damages awards together, reasoning that the acts of trespass and conversion were a "single course of wrongful conduct" for the purpose of the trespass was to seize the machines. It added together the compensatory damages for trespass and conversion, which were about $1.45 million, and compared that sum to the combined amount of punitive damages, approximately $2.24 million, thus concluding that the punitive damages were well within constitutional limits. The district court observed that the resulting ratio between compensatory and punitive damages was below some approved by our court in prior cases. JCB defends this approach, but the Bank argues the awards should be addressed separately.

Trespass and conversion protect distinct legal rights, and here the torts were based on separate actions by the Bank. An action in trespass traditionally protects the proprietary interest of the owner or possessor of land, see Motchan v. STL Cablevision, Inc., 796 S.W.2d 896, 898 (Mo. Ct. App. 1990), and the Bank's trespass was based on ATEC's entry onto JCB's fenced lot. In contrast, conversion violates an owner's right of possession in personal property. See Carter v. White, 241 S.W.3d 357, 362 (Mo. Ct. App. 2007). The Bank's conversion involved its taking possession of the equipment and retaining it even after JCB demanded its return. Both torts are punishable by punitive damages under Missouri law, see Wright, 619 S.W.2d at 803; Dayton Constr., 882 S.W.2d at 209, and the district court and jury treated the two torts as distinct during the trial on damages. Because "exacting appellate review ensures that an award of punitive damages is based upon an application of law, rather than . . . caprice," State Farm, 538 U.S. at 418 (quotation omitted), the way in which the issue was presented to the jury is relevant to our review. Here, punitive damages were awarded separately at trial, for different acts causing distinct legal harms.

To be sure, a single punitive damages instruction for separate counts of trespass and conversion "'may be adequate'" under Missouri law when the acts underlying each tort were "'identical.'" McKamely v. Hession, 704 S.W.2d 702, 703 (Mo. Ct. App. 1986), quoting Weldon v. Town Prop., Inc., 633 S.W.2d 196, 199 (Mo. Ct. App. 1982). If "the trespass count relate[s] to an unauthorized entry" onto property, however, and "the conversion count refer[s] to the repossession of personal property found" where the trespass occurred, the "courses of conduct [a]re separate and distinct, requiring separate punitive damage instructions to be submitted." McKamely, 704 S.W.2d at 702 (describing Weldon). The Bank's acts of trespass involved an unauthorized entry onto JCB's lot, and its conversion was based on its repossession of equipment located on that lot. Although related, the wrongful acts leading to the Bank's trespass and conversion were not identical. Missouri courts have required separate punitive damages instructions for each tort under very similar circumstances. See Weldon, 633 S.W.2d at 199. The district court's separate

treatment of the torts at trial was consistent with Missouri law, and we conclude that it is similarly appropriate to consider the individual punitive damage awards separately on the Bank's challenge on appeal.

We review de novo the district court's ruling on the constitutionality of the punitive damage awards. Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 436 (2001). Although states have broad discretion to impose punitive damages for the legitimate state purposes of punishment and deterrence, those awards are subject to both procedural and substantive limitations under the due process clause of the fourteenth amendment.[7] See State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003); see also BMW of North America, Inc. v. Gore, 517 U.S. 559, 568 (1996). Our review of the constitutionality of punitive damage awards is guided by a three factor test set by the Supreme Court: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." State Farm, 538 U.S. at 418, citing Gore, 517 U.S. at 575.[8]

---

[7]Since this action was filed Missouri has passed a statute limiting punitive damages to $500,000 or five times the net amount of the judgment against the defendant, whichever amount is greater. Mo. Rev. Stat. § 510.265.

[8]The parties have framed the discussion of punitive damages in federal due process terms. Although the Bank mentioned Letz v. Turbomeca Engine Corp., 975 S.W.2d 155, 178 (Mo. Ct. App. 1997), it did not analyze any of its factors and we do not understand the Bank to raise a state law challenge to the punitive damages award. See Meyers v. Starke, 420 F.3d 738, 743 (8th Cir. 2005) ("To be reviewable, an issue must be presented in the brief with some specificity."). Nor did the district court opinion discuss whether the award was excessive under state law. See Bearden v. Lemon, 475 F.3d 926, 929-30 (8th Cir. 2007) (court of appeals does not ordinarily consider issues not ruled on by district court).

In converting JCB's property the Bank acted with "callous disregard" of JCB's rights, and the reprehensibility of its conduct was comparable to the conduct which supported punitive damages in prior business cases. Diesel Machinery, 418 F.3d at 840; see also Asa-Brandt, Inc. v. ADM Investor Servs., Inc., 344 F.3d 738, 746-47 (8th Cir. 2003). The Bank's tortious conduct involved in the conversion was not "accidental or inadvertent." Eden Elec., Ltd. v. Amana Co., 370 F.3d 824, 828 (8th Cir. 2004). Rather, the Bank deliberately decided to seize JCB's equipment, although it had never made loans against that specific collateral and although Machinery at the time had a zero balance on the principal and interest on its loan from the Bank. JCB demanded that the equipment be returned, but the Bank retained it nonetheless. When the Bank sold the equipment it knew that JCB asserted a priority security interest in it and had offered another method of sale, but the Bank nevertheless proceeded with the auction, obtaining less than full value for the equipment. Although JCB had demanded the proceeds from the auction, the Bank retained the funds for itself, placing them in a noninterest bearing account with the proceeds from other collateral.

The ratio between the damage awards for conversion is approximately 1:1 ($1,100,000 compensatory and $1,150,000 punitive damages). See State Farm, 538 U.S. at 425 (suggesting that punitive damages equal to compensatory damages are within constitutional limits "[w]hen compensatory damages are substantial").[9] As neither party refers to comparable civil penalties for conversion, we do not consider that factor. See Asa-Brandt, 344 F.3d at 747 n.16. We conclude that the jury award of punitive damages for the Bank's conversion does not exceed due process limits.

_____

[9]After this case was argued, the Supreme Court determined that a 1:1 ratio of compensatory to punitive damages was appropriate in a maritime case, but it did not mandate this ratio as a matter of constitutional law. See Exxon Shipping Co. v. Baker, 128 S. Ct. 2605, 2626 (2008) ("Today's enquiry differs from due process review because the case arises under federal maritime jurisdiction, and we are reviewing a jury award for conformity with maritime law, rather than the outer limit allowed by due process.").

The $1,087,500 in punitive damages assessed by the jury for the Bank's trespass is more troublesome. Although the Bank emphasizes the disparity between the $1 compensatory and punitive damages for its trespass, the nominal amount of the compensatory damages for that tort does not on its own preclude a punitive damages award of this size. Punitive damages may withstand constitutional scrutiny when only nominal or a small amount of compensatory damages have been assigned, even though the ratio between the two will necessarily be large. See Saunders v. Branch Banking & Tr. Co. of Va., 526 F.3d 142, 154 (4th Cir. 2008) (collecting cases). The Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula." Gore, 517 U.S. at 582; State Farm, 538 U.S. at 424-25. As noted by the Court, a higher ratio "may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." State Farm, 538 U.S. at 425 (internal quotation omitted); see also Exxon Shipping Co. v. Baker, 128 S. Ct. 2605, 2622 (2008) ("'Thus an award of nominal damages . . . is enough to support a further award of punitive damages, when a tort, . . . is committed for an outrageous purpose, but no significant harm has resulted.'") (quoting 4 Restatement § 908, Comment c, p. 465). Our court as well as the Missouri courts have affirmed punitive damages supported by only nominal compensatory damages. See Asa-Brandt, 344 F.3d at 743 & 747 (affirming $1.25 million on a breach of fiduciary duty claim with nominal damages); Labrier v. Anheuser Ford, Inc., 621 S.W.2d 51, 58 (Mo. banc 1981) (collecting cases).

The issue here of course is whether in this case the punitive damages award for the Bank's trespass is constitutionally excessive. See Saunders, 526 F.3d at 154. The Bank directed ATEC to enter JCB's fenced lot without permission or notification, and the trespass was done for the purpose of seizing and selling JCB's collateral. The Bank's trespass was sufficiently reprehensible to warrant a substantial penalty. See Diesel Machinery, 418 F.3d at 839-40; Asa-Brandt, 344 F.3d at 746-47; cf. Gore, 517 U.S. at 575 (reprehensibility is "perhaps the most important indicium of the

-17-

reasonableness of a punitive damages award"). The state has a legitimate interest in punishing and deterring such trespasses, as well as the risk of violent confrontation which may arise from them. Missouri authorizes criminal fines of $2000 for trespass, or double a corporation's gain from the offense, as well as a term of imprisonment of up to six months. See Mo. Rev. Stat. §§ 569.140, 560.021.1, 558.011(6). The highest punitive damage award we found in a comparable Missouri case was $400,000 – based on actual damages of $25,000 for conversion and $5,000 for trespass – against a repair company which repossessed a bulldozer from a couple after they defaulted on payments for repairs on the machine. Perkins v. Dean Machinery Co., 211 S.W.3d 148, 148 (Mo. Ct. App. 2007) (affirming punitive award); Perkins, 132 S.W.3d at 298-99 (underlying facts and actual damages). Although that award covered both trespass and conversion, it was significantly lower than the punitive damages JCB received for trespass alone. And while the Bank's trespass was necessary for it to effect its conversion, a separate award punished that tort and compensated JCB for its loss on the sale. Under all the circumstances we conclude that the $1,087,500 awarded in punitive damages for the Bank's trespass was beyond what due process will permit.

When faced with an award which exceeds due process limits, it is appropriate to remit it to an amount which is "sufficiently punitive, but that does not violate notions of fundamental fairness." Conseco Finan. Serv. Corp. v. North American Mortgage Co., 381 F.3d 811, 825 (8th Cir. 2004). Neither the Bank nor JCB has suggested an alternate amount of punitive damages in the event that the award were found to be beyond constitutional bounds. JCB has not cited any comparable trespass cases with such a high ratio between the punitive damages and compensatory awards, but the Bank cited Jacque v. Steenberg Homes, Inc., 563 N.W.2d 154, 156 (Wis. 1997), a trespass case in which punitive damages of $100,000 withstood constitutional scrutiny although the underlying compensatory award was nominal. The Bank's citation of this case implies that it would have had notice that its conduct could lead to penalties of up to $100,000. See Gore, 517 U.S. at 574 ("Elementary notions of fairness . . . dictate that a person receive fair notice not only of the conduct that will

-18-

subject him to punishment, but also of the severity of the penalty that a State may impose."). We conclude that in this case a reduction of the jury's punitive damages award for trespass to one tenth the original amount would recognize the reprehensibility of the Bank's trespass but not offend the constitutional concerns which have been articulated by the Supreme Court. An award of $108,750 in punitive damages would punish the Bank's trespass and deter such conduct in the future, while not violating the Bank's due process rights. This amount is also consistent with a comparable case cited by the Bank. We conclude that the amount of punitive damages for the Bank's trespass should be remitted to $108,750.

IV.

The Bank objects to the interest awarded to JCB on the conversion claim, challenging the district court's jury instructions and evidentiary rulings which JCB defends. We normally review a district court's jury instructions for abuse of discretion, limiting our consideration to whether the instructions fairly and accurately present the evidence and law to the jury given the issues in the case. Eden Elec., 370 F.3d at 827. If the challenge has not been preserved for review by objection below, however, we apply a plain error standard, reversing only when the error would result in a miscarriage of justice if left uncorrected. See Kight v. Auto Zone, Inc., 494 F.3d 727, 735 (8th Cir. 2007).

The Bank argues that the district court erred in instructing the jury that a 9% per annum rate – the rate from Mo. Rev. Stat. § 408.020 – would apply from the time of conversion if it chose to award additional compensatory damages in the nature of interest. The Bank advocates for a lower rate from another statutory section: the federal funds rate plus 3% from § 408.040. The Missouri Court of Appeals has concluded, however, that the 9% rate in § 408.020 applies to conversion. See Stromberg v. Moore, 170 S.W.3d 26, 32-33 (Mo. Ct. App. 2005); see also Independence Flying Serv., Inc. v. Ailshire, 409 S.W.2d 628, 631-32 (Mo. 1966). The

Bank also contends that the district court should have instructed the jury that it could "consider the good faith of [the Bank] in determining the date from which interest began to run," but interest is normally awarded from the date of conversion under § 408.020. See Stromberg, 170 S.W.3d at 32. Moreover, the Bank did not object to either the 9% interest rate or the removal from the instruction of any reference to good faith when the jury was charged and it did not preserve the issue for review. See Kight, 494 F.3d at 735. The district court did not plainly err in its jury instructions relating to interest.

The Bank contends that the district court should not have admitted testimony that JCB could have earned a 12% to 20% rate of return on an investment. Although it now characterizes that evidence as speculative and prejudicial, it did not object to its introduction at trial and thus we review for plain error. See Spencer v. Young, 495 F.3d 945, 949 (8th Cir. 2007). The district court did not plainly err by admitting this evidence, and in any event, the testimony had no effect on the amount of interest imposed because the district judge told the jury what rate to apply. See Batiste-Davis v. Lincare, Inc., 526 F.3d 377, 381 (8th Cir. 2008) (improper admission of evidence was harmless where it did not have a substantial effect on the jury's verdict).

## V.

Accordingly, we affirm the judgment of district court in all respects except for the punitive damage award for trespass which must be remitted to $108,750 on due process grounds. We therefore reverse that award and remand the case to the district court for entry of an amended judgment consistent with this opinion.

COLLOTON, Circuit Judge, concurring in part and dissenting in part.

I concur in all but Part III.B of the opinion of the court. As to that section, I do not agree that the jury's award of punitive damages under Missouri law violates the

substantive due process rights of Union Planters Bank, N.A. I would therefore affirm the judgment of the district court.

In considering whether the punitive damages were excessive, the district court concluded that the Bank's unlawful trespass and conversion were "inextricably intertwined," because the Bank trespassed on the property of JCB, Inc., for the sole purpose of taking possession of JCB's equipment. The district court thus considered the two torts together when comparing the punitive damages (i.e., $1,150,000 for conversion and $1,087,500 for trespass) with the compensatory damages (i.e., $1,450,000 for conversion and $1 in nominal damages for trespass). The court then concluded that "the jury's punitive damages award of less than twice the actual damages was both reasonable and proportionate, considering the egregious nature of [the Bank's] conduct."

As the case comes to us, the Bank does not challenge the district court's application of Missouri law, *ante*, at 15 n.8, so we presume that Missouri authorizes a punitive damages award of this amount under these circumstances. "In our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996). The Bank raises no claim that the procedures applied in this case were unfair, and a judgment that is a product of fair procedures "is entitled to a strong presumption of validity." *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 457 (1993) (plurality opinion); *Gore*, 517 U.S. at 586-87 (Breyer, J., concurring).

In conducting its substantive due process analysis, the majority decides to examine separately the punitive damages awards for conversion and trespass, and thus emphasizes a comparison between the punitive damages award of $1,087,500 for trespass and a nominal damage award of $1. The majority never really explains, however, why this divide-and-conquer approach is dictated by federal constitutional

law. It reasons instead that separate consideration of the two damages awards for constitutional purposes is "appropriate," because the use of separate verdict forms at trial was "consistent with" Missouri law. *Ante*, at 14. But the Bank (and the majority) cannot have it both ways. If there is no challenge to the damages award under Missouri law, then the substantive due process challenge raised by the Bank presupposes that Missouri accepts the district court's conclusion that the torts of conversion and trespass in this case were "inextricably intertwined," and that the damages awards should be analyzed as such.

The relevant authority from Missouri, moreover, permits a jury to consider punitive damages together for trespass and conversion in certain circumstances. *See McKamely v. Hession*, 704 S.W.2d 701, 702 (Mo. Ct. App. 1986). This precedent establishes that Missouri necessarily is content to consider punitive damages awards for separate torts in the aggregate when evaluating excessiveness, for it would be impossible to separate them once a jury returns a single award in accord with *McKamely*. That Missouri law sometimes requires separate punitive damages instructions on each tort to ensure that the defendant acted with *the requisite mental state* when committing each tort, *see Weldon v. Town Prop., Inc.*, 633 S.W.2d 196, 199 (Mo. Ct. App. 1982), says nothing about whether Missouri would aggregate the damages awarded for inextricably intertwined torts when considering *excessiveness*, once the necessary culpability is established. The absence of a challenge in this case to the punitive damages under Missouri law, which incorporates the federal constitutional standards into its state-law excessiveness inquiry, *see Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 178 (Mo. Ct. App. 1997), fortifies the conclusion that Missouri treats the torts in a manner that is most likely to make the State's action constitutional. If Missouri law indeed required separate consideration of the two torts when evaluating the potential excessiveness of a damages award, then Missouri law (incorporating the federal standards) would require a remittitur for the same reasons set forth in the majority's analysis, and there would be no reason to declare Missouri law unconstitutional.

As a matter of federal constitutional law, I cannot say that Missouri's decision to permit an award of punitive damages that is less than double the actual damages caused by the intertwined torts is state action that "furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003). Both torts were necessary steps in the Bank's course of conduct to harm JCB, and it is reasonable for a State to consider them together in assessing whether a punitive damages award is excessive. Although "[t]respass and conversion protect distinct legal rights," *ante*, at 13, the majority itself recognizes that "the trespass was done for the purpose of seizing and selling JCB's collateral;" indeed, it was done solely for that purpose. Accordingly, I agree that "[t]he Bank's trespass was sufficiently reprehensible to warrant a substantial penalty." *Ante*, at 17. Once it is recognized that a State may consider the purpose of the trespass in determining punitive damages, I do not think constitutional law dictates that the State may give partial weight to the resulting conversion (thus justifying punitive damages of $100,000 for trespass, despite only $1 in actual damages for the trespass standing alone), but may not fully consider the conversion in determining punitive damages for the trespass that enabled the conversion.

Accepting that the State reasonably may consider the Bank's course of conduct as a whole in assessing punitive damages, the relevant guideposts show that the punitive damages award is constitutional. *See generally Gore*, 517 U.S. at 575-85. For the reasons stated in the majority's analysis of reprehensibility, *ante*, at 15-16, the Bank's conduct, viewed in the light most favorable to the verdict, supports an award of this magnitude under our precedents. *Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 839-40 (8th Cir. 2005); *Asa-Brandt, Inc. v. ADM Investor Serv. Inc.*, 344 F.3d 738, 746-47 (8th Cir. 2003). The ratio of punitive damages as a whole to compensatory damages for the interrelated torts is less than 2:1, and thus well within the ratios approved by the Supreme Court and our court. *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24 (1991) (approving 4:1 ratio); *State Farm*, 538 U.S. at 425 (noting that the Court in *Gore* "referenced a long legislative history, dating

back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish," and that these ratios are "instructive."); *Eden Elec., Ltd. v. Amana Co.*, 370 F.3d 824, 829 (8th Cir. 2004) (approving 4.5:1 ratio); *Diesel Machinery*, 418 F.3d at 820 (approving 4:1 ratio).

The damages awards in this case are large, and the record would support inferences that cast the Bank's actions in a more sympathetic light. But viewing the evidence in the light most favorable to the verdict, and giving Missouri the flexibility it is due in our federal system to further its legitimate interests in punishing unlawful conduct, I would affirm the judgment of the district court upholding the jury's verdicts.

_____